# Richmond

## J. G. STUMP v. NORFOLK SHIPBUILDING AND DRY DOCK CORPORATION, ETC.

June 14, 1948.

Record No. 3383.

Present, Gregory, Eggleston, Spratley, Buchanan, Staples and Miller, JJ.

The opinion states the case.

*Louis B. Fine* and *Joseph D. Deal*, for the appellant.

*Venable, Miller, Parsons & Kyle*, for the appellees.

BUCHANAN, J., delivered the opinion of the court.

This is an appeal from an award of the Industrial Commission denying compensation on the ground that the claimant had refused to accept proffered medical attention. Code, 1942 (Michie), section 1887(26).

The claimant, Stump, was employed by Norfolk Shipbuilding and Dry Dock Corporation, herein called the employer, as a tool checker. He worked in the tool room and his job was to hand out tools to other employees. While so engaged he struck his shin bone on a steel wheel puller, which caused a small bruise at the site of an old fracture. In his evidence the claimant said this happened on September 14, 1946. In his application to the Industrial Commission for a hearing he stated it happened on or about September 2, 1946.

He first reported to Dr. Healy, company physician, on September 16, 1946, who found an infected abrasion, which he treated by removing some necrotic tissue and applying an elastic bandage. Dr. Healy thought there was no reason for the claimant to stop work, as he could sit down at his job, but directed him to return at intervals for treatment. The claimant did not return as directed, except as later noted, but undertook to treat himself. His injury did not heal, but developed into a large ulcer and finally on April 15, 1947, his leg had to be amputated.

A hearing was had before Chairman Nickels, of the

Industrial Commission, who denied the claim for compensation on the ground, as stated in his written opinion, that "the preponderance of the evidence shows that all the complications which led to the amputation were due to his lack of co-operation and inexcusable refusal to receive the medical attention tendered him." On review by the full Commission the findings of fact and conclusions of law by Chairman Nickels were affirmed and adopted as the opinion of the Commission.

Section 26 of the Workmen's Compensation Act (Acts 1918, ch. 400, p. 637, as amended; Code, 1942 (Michie), section 1887(26)) provides, in part, that for a period not exceeding 60 days after an accident the employer shall furnish, free of charge, to the injured employee, such necessary medical attention as the nature of the accident may require, and the employee shall accept it, and during the remainder of disability, the employer may furnish, free of charge, an attending physician, whom the employee shall accept, with certain exceptions and additions not here involved. In the second paragraph of the section is this provision:

"The refusal of the employee to accept such service when provided by the employer shall bar said employee from further compensation until such refusal ceases, and no compensation shall at any time be paid for the period of suspension unless, in the opinion of the Industrial Commission, the circumstances justified the refusal, in which case the Industrial Commission may order a change in the medical or hospital service."

The questions presented by the assignments of error are whether the employer furnished adequate medical services and attention, and whether the claimant refused to accept them to such an extent as to bar him from compensation. The answers to those questions are to be looked for in the evidence, which we are required to consider in the manner prescribed by statute.

By section 61 of the Workmen's Compensation Act (Code, 1942 (Michie), section 1887(61)), as we have many

times held, "the Commission's findings of fact, when based on evidence deemed by it to be credible, are conclusive and binding on us, and in the absence of fraud are not subject to review. *Carter* v. *Hercules Powder Co.,* 182 Va. 282, 288, 28 S. E. (2d) 736, 739, and cases there cited." *Estep* v. *Blackwood Fuel Co.,* 185 Va. 695, 696, 40 S. E. (2d) 181. *Humphries* v. *Newport News Shipbuilding, etc., Co.,* 183 Va. 466, 32 S. E. (2d) 689; *Griffey* v. *Clinchfield Coal Corp.,* 183 Va. 715, 33 S. E. (2d) 178.

When Dr. Healy first treated the claimant on September 16, he told him to return for further attention two days later. The claimant did not return as directed, and Dr. Healy went to the tool room to talk to him and tried to explain to him how serious the trouble was, due to the fact that the ulcer was superimposed on an old area of discolored skin, caused by the old fracture in 1929. The claimant was very indefinite and would not promise to come back. Dr. Healy did not see him again until October 18, at which time his leg was about in the same condition—still with an infected abrasion. He was again instructed to come back in two days, which he did. Then the bandage put on by the doctor had been removed and there was a very badly soiled piece of cloth on the place and some sort of grease on the wound, which the doctor cleaned off with ninol and ether. Stump was again instructed to come back two days later, which he did not do, and the doctor did not see him again until December 5, about six weeks later. His leg was then a little worse, and the doctor again sought to impress upon him the importance of having it attended to. In turn, Stump tried to impress on the doctor how well he had been able, himself, to take care of other ulcers he had had on his legs, stating that he had had a similar accident in May and had cured it himself. He never returned to Dr. Healy for treatment after December 5. Dr. Healy testified that he made every effort to get the claimant to come to see him regularly, but he refused to do it.

In addition to Dr. Healy's efforts, the shop foreman, Gray, at the request of the nurse in charge, told Stump to go to

the first aid room, but got no definite promise from him. Dr. Healy and the nurse also called Stump's immediate boss, Blount, to see if he could get him to come for treatment. Blount saw him several times and told him to go. He testified that Stump went places, but whether he went to the first aid room he did not know.

Torbert, a machinist, who was safety marshal and worked right at the tool room, and who was a friend of Stump's, testified that on different occasions he was asked by the nurse, as a favor to her and to Stump, to request Stump to come in for treatment. He did so, but Stump did not go. He saw Stump five different times. Torbert and his father, who was a wholesale druggist, talked to Stump several times about his leg. It seemed to be healing from the top and Stump was pulling the skin up from time to time to try to get healing from the bottom first. He asked Torbert if he could get him a mixture of mutton tallow and turpentine. Torbert said Stump was trying to get cured all by himself, and told Torbert he was not going to see the doctor and the nurse any more, as he could do more for his leg than they could.

The insurance carrier was informed that Stump was not reporting for treatment, and on January 31, 1947, its agent wrote Stump urging him to report promptly to the nurse at the plant and regularly after that to receive treatment from the doctor and nurse, and advising Stump that if he did not accept the medical treatment that was offered he would have to assume all responsibility for resulting complications.

The claimant did not contradict any of this evidence. His testimony was that he went to the first aid room as much as he could, which was eight or ten times, and that the reason he did not go oftener was because, as he expressed it, his job was at stake; that he had been told that if he went out without leaving anybody in the tool room they would put another man in his place; that his instructions were not to leave the tool room for anything unless Mr. Blount gave him

leave. But he admitted that this was some time before he received his injury and related to an entirely different matter.

On the other hand there was evidence that permission to go for treatment could have been had at any time for the asking. Not only so, but his immediate superiors, the doctor and the nurse, as well as his friend and co-worker, repeatedly urged him to go for treatment. The shop foreman on one or two occasions offered to furnish him relief. The latter's office opened into the tool room where Stump worked. Blount testified he could watch the tool room without staying in it, and had taken care of it all the time Stump was missing.

Stump did not claim that he ever made a specific request to go for treatment which was refused. He admitted that Blount on one occasion told him to go ahead and he would take care of the tool room. He testified to only one other occasion when he asked Blount for permission to go and Blount said he would be there in a minute and did not come and did not send anybody to relieve him. Blount said he could recall no such incident. The Commission found that "the facts show very clearly that he could have reported at any time he so desired by merely notifying his immediate superior."

Other than his own evidence, Stump offered no testimony except letters from his doctors, which merely described his condition and their treatments. Dr. Steingold first treated him in January, 1947. He did not give the date, but it is to be inferred that it was late in January, as he wrote that the ulcers did not heal and Stump was hospitalized under his care from February 18 to February 28, 1947. Very slight improvement was shown. A large ulcer appeared on the heel, gangrene was developing, so he sent him to Dr. Lowenberg. The latter first saw him on April 1, and found a swollen, extensively ulcerated leg with the main arteries obstructed, and the amputation was performed. He wrote that Stump made a relatively uneventful convalescence. The Commission found that he had continued working until February 18, 1947, but was temporarily totally

disabled from that time to the date of the hearing (June 30, 1947).

The evidence of Dr. Healy was that if Stump had come to him and taken treatments regularly he felt positive that his trouble would have been cured. There is no evidence of any kind to the contrary.

If it can be said that the testimony of the claimant produced a conflict on the question whether adequate medical service was offered, and that Stump refused to accept it, it did no more than that. The evidence is, in fact, convincing that Stump refused the medical attention offered him and urged upon him, without any excuse for doing so other than his notion that he could take care of himself. This was not a legal excuse.

The duty of the employee to accept such necessary medical attention as the nature of the accident may require is made compulsory by the statute. His refusal to do so, by like mandate of the statute, bars him from compensation until such refusal ceases. To have that consequence his refusal must be unreasonable and without just cause. *Witte* v. *Winkler & Sons*, 98 Ind. App. 466, 190 N. E. 72, 75.

In *Jendrus* v. *Detroit Steel Products Co.*, 178 Mich. 265, 144 N. W. 563, 566, Ann. Cas. 1915D, 476, this is quoted from the opinion of Clerk, L. J., in *Donnelly* v. *Baird & Co., Ltd.* (Court of Session, Scotland, 1908), 45 Scottish Law Reporter, 394; 1 Butterworths' Workmen's Compensation Cases, 95:

" ' * * * I think the sound view on this matter is well expressed by Lord Adam in the case of *Dowds* v. *Bennie & Son*, 40 S. L. R. 239, when he laid it down that a workman who has been incapacitated is not bound in every case to submit to any medical or surgical treatment that is proposed, under the penalty, if he refuses, of forfeiture of his right to a weekly payment—e. g., in the case where a serious surgical operation is proposed with more or less probability of a successful cure. On the other hand, I hold it to be the duty of the injured workman to submit to such treatment, medical or surgical, as involves no seri-

ous risk or suffering, such an operation as a man of ordinary manly character would undergo for his own good, in a case where no question of compensation due by another existed. * * * ' "

The *Jendrus Case* also refers to *Warncken* v. *Moreland & Son, Ltd.* (Court of Appeal, England, 1908), 100 Law Times, 12; 2 B. W. C. C. 350, where a workman's refusal to submit to a simple surgical operation, involving no serious risk to life or health, and which, according to medical opinion, offered reasonable prospect of cure, was held to bar him from compensation, on the ground that his continued disability was not attributable to the original accident, but to his unreasonable refusal to avail himself of surgical treatment. "Moulton, L. J., said: 'To hold the contrary would lead to this result, that a workman who had an injury, however small, might refuse to allow it to be dressed, and let a trivial burn, say, become a sloughing sore, and lead to partial or total incapacity. * * * The distinction is between being reasonable and unreasonable.' " (p. 567).

In *Lesh* v. *Illinois Steel Co.,* 163 Wis. 124, 157 N. W. 539, it was held that where the claimant unreasonably refused to undergo a safe and simple surgical operation, fairly certain of favorable results, and not attended with serious risk or pain, the resultant disability was not proximately caused by the accident, but was the direct result of such unreasonable refusal. See also 10 Neg. and Comp. Cases Anno., p. 185; Schneider, Workmen's Compensation Law (2 ed.), section 496, p. 1644, *et seq.*; Horovitz, Current Trends, Workmen's Compensation, pp. 641, *et seq.* (Reprint from The Law Society Journal, Vol. 12, pp. 465, 611, 765).

■ The Commission's findings of fact are amply supported by the evidence and we find no error in the award appealed from.

*Affirmed.*